```
___ FILED          ___ RECEIVED
___ ENTERED        ___ SERVED ON
          COUNSEL/PARTIES OF RECORD

        AUG 17 2018

     CLERK US DISTRICT COURT
        DISTRICT OF NEVADA
BY:_____ DEPUTY
```

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. [UNDER SEAL], and<br><br>   Plaintiffs,<br><br>v.<br><br><br><br><br><br>[UNDER SEAL],<br><br>   Defendant. | CIVIL ACTION NO:<br>_____<br><br>**FILED UNDER SEAL**<br><br>*DO NOT FILE IN PACER*<br><br>JURY TRIAL DEMANDED |

FILED UNDER SEAL

2:18-cv-01550-MMD-CWH

1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. WILLIAM O'DONNELL | 2:18-cv-01550-MMD-CWH |
| Plaintiff/Relator, | CIVIL ACTION NO: _____ |
| v. | |
| UNIVERSAL HEALTH SERVICES, INC., THE VALLEY HEALTH SYSTEM and DESERT SPRINGS HOSPITAL MEDICAL CENTER | **FILED UNDER SEAL**<br>**JURY TRIAL DEMANDED** |
| Defendants. | |

## FALSE CLAIMS COMPLAINT AND DEMAND FOR JURY TRIAL

### I. INTRODUCTION

1. Relator William O'Donnell ("Relator") brings this action on behalf of the United States against Defendants Universal Health Services, Inc. ("UHS"), The Valley Health System ("VHS") and Desert Springs Hospital Medical Center ("DSH") for treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*. UHS is a national hospital management company with over 350 healthcare facilities. VHS is owned and operated by UHS. DSH is owned and operated by VHS. These facilities contract with Medicare to provide healthcare services.

2. Relator is a licensed physical therapist at DSH in Las Vegas, Nevada. He began working for DSH in 2013 and his responsibilities include providing physical therapy to DSH clients.

2

3. During his employment, Relator discovered that DSH was billing Medicare under Part B coverage for acute rehabilitation services in circumstances where individuals were not eligible for this type of Medicare coverage. In addition, he discovered that DSH was converting and re-submitting Medicare Part A forms to Part B documentation after Part A claims were denied reimbursement.

4. In short, in order to receive per diem payments from the federal Medicare agency, DSH billed services to Medicare Part B that did not qualify for such coverage. DSH actually billed Medicare for these patients and received per diem payments from the Government for the acute rehabilitation of these ineligible patients.

## II. JURISDICTION AND VENUE

5. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

6. At all times material to this Complaint Defendants UHS, VHS and DSH regularly conducted substantial business within the State of Nevada, maintained permanent employees and offices in Nevada, and made and is making significant sales within Nevada. Defendants are therefore subject to personal jurisdiction in Nevada.

7. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants conducts business within this district.

## III. PARTIES

8. Relator is a citizen of the United States over the age of nineteen and a resident of Nevada.

9. Relator is the original source of the information underlying this Complaint and that has been provided to the Government. Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government as required by the False Claims Act, 31 U.S.C. § 3730(b)(2). Relator does not believe that any of the information underlying the allegations and transactions in this complaint has been publicly disclosed.

10. Defendant Universal Health Services, Inc. ("UHS") has its corporate headquarters at 367 South Gulph Road, King of Prussia, Pennsylvania 19406. Defendant UHS provides healthcare services nationwide. At all times relevant to this action, UHS was principally engaged in providing acute rehabilitation to individuals through Medicare.

11. Defendant The Valley Health System ("VHS") is a UHS subsidiary with its corporate headquarters at 2075 East Flamingo Road, Las Vegas, Nevada 89119. Defendant VHS provides healthcare services in Nevada. At all times relevant to this action, VHS was principally engaged in providing acute rehabilitation to individuals through Medicare.

12. Defendant Desert Springs Hospital Medical Center ("DSH") is a VHS subsidiary with its offices at 2075 East Flamingo Road, Las Vegas, Nevada 89119. DSH is a critical access hospital that provides acute rehabilitation services, including physical therapy, occupational therapy, and speech-language pathology services.

## IV. THE MEDICARE PROGRAM

13. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

14.     Part A of the Medicare Program is a 100 percent federally funded health insurance program for qualified residents of the United States aged 65 and older, younger people with qualifying disabilities, and people with end-stage renal disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. Part A covers inpatient hospital care, acute rehabilitation, skilled nursing facility, hospice, lab tests, surgery, and home health care. An individual is an inpatient starting when he is formally admitted to the hospital with a doctor's order. The day before the patient's discharge is considered the last inpatient day.

15.     The Government provides reimbursement for Medicare claims from the Medicare Trust Fund through the Centers for Medicare and Medicaid Services ("CMS"). CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as "fiscal intermediaries" ("MACs"), to review, approve, and pay Medicare bills, called "claims," received from healthcare providers, such as UHS, VHS and DSH. In this capacity, the MACs act on behalf of CMS.

16.     Payments are typically made directly to healthcare providers, such as UHS, VHS and DSH, rather than to the patient. This occurs when the Medicare recipient assigns his or her right to payment to the provider. The provider either submits its bill directly to Medicare for payment or contracts with an independent billing company to submit a bill to Medicare on the provider's behalf.

17.     In order to bill the Medicare Program, a healthcare provider typically submits an electronic claim form or a hard-copy claim form called a UB04 form.

18.     On the UB04 form, the healthcare provider must state, among other things, the identity of the patient, its provider number, the patient's principal diagnosis, the date of the

patient's certification or re-certification as needing the services, the location where services were provided, and the level of care provided.

19. Part A services are reimbursed under a prospective payment system that pays facilities a per diem rate covering all patient-related expenses, including nursing services, therapy services—calculated in minutes—and a daily room charge. The reimbursement rate for each patient is based on the type and quantity of skilled services the patient will need.

20. An acute care facility provides immediate care for traumas and injuries, severe or sudden illness, or recovery from surgery. Generally, stays are brief in acute care, and patients are sent home or transferred to other medical facilities as soon as they are stable. DSH is an acute care facility.

21. Many patients at these facilities who have suffered from these injuries undergo acute rehabilitation, an intensive, multidisciplinary rehabilitation program. In an acute rehabilitation program, patients receive physical therapy, occupational therapy and speech-language pathology services as needed. A physician, who is trained in rehabilitation, manages each patient's care. Patients are seen by their attending physician every day. In an acute rehabilitation setting, a patient is expected to make significant functional gains and medical improvement within a reasonable time frame. Patients receive at least three hours of therapy per day, for up to five days a week. Inpatient acute rehabilitation stays usually only last a couple of weeks.

22. In contrast, Medicare Part B helps patients pay for medically necessary outpatient physical therapy, occupational therapy, and speech-language pathology services. Medicare Part B claims are submitted on a HCFA 1500 form. An individual is considered outpatient if he is receiving hospital services and a doctor has not written an order to admit him to a hospital as an

inpatient. Without the order, the individual is an outpatient even if he spent the night in the hospital. DSH does not provide outpatient therapy.

23. Skilled nursing care is healthcare given when a patient needs licensed nursing or therapy staff to treat, manage, observe, and evaluate his care. Part A requires a 3-day inpatient hospital stay before covering skilled nursing care. DSH does not have a skilled nursing facility, nor does it provide skilled nursing care.

24. All healthcare providers, including Defendants, must comply with applicable statutes, regulations, and guidelines to be reimbursed by the Government. A provider has a duty to have knowledge of the statutes, regulations, and guidelines regarding coverage for Medicare services, including, but not limited to, the following: that in the case of acute rehabilitation, Medicare only reimburses services that are reasonable and necessary for the diagnosis or treatment if illness or injury or to improve the functioning of a malformed body member. *See* 42 U.S.C. § 1395y(a)(1)(A).

25. Medicare regulations exclude from payment healthcare services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* 42 C.F.R. § 411.15(k)(1).

26. Because it may not be feasible to review medical documentation before paying each claim to establish that each covered Medicare item or service is reasonable and medically necessary and to ensure that all other Medicare requirements are satisfied (if any), the MACs generally make payment under Medicare Part A once the provider submits its Medicare claim form with its certifications that the claim "is correct and complete," that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file," and that "[r]ecords adequately disclosing services will be maintained and necessary information will be furnished to

government agencies as required by applicable law." The claims are paid from the Medicare Trust Fund, funded by American taxpayers.

## V. **FACTUAL ALLEGATIONS**

### A. Defendants Pursued a Pattern and Practice of Fraudulently Billing Medicare Part B for Inpatient Acute Rehabilitation

27. Medicare Part A covers inpatient hospital services such as semi-private rooms, drugs, general nursing, and meals. Part A also covers services provided in acute care hospitals, such as physical therapy, occupational therapy, and speech-language pathology services.

28. For a patient to be covered under Part A, the following requirements must be met: a doctor must make an official order saying the patient needs 2 or more midnights of medically necessary care to treat the illness or injury; the hospital must formally admit the patient; the patient needs the kind of care only a hospital can provide, the hospital must accept Medicare; and the hospital's Utilization Review Committee must approve the patient's stay while there.

29. Patients with Medicare Part B are all covered for outpatient physical therapy, occupational therapy, and speech-language pathology services as long as the services are medically reasonable and necessary.

30. Defendants followed a pattern and practice of fraudulently billing Medicare for outpatient physical therapy, occupational therapy, and speech-language pathology services under Part B. Defendants resubmitted Medicare Part A claims that were denied for not being medically reasonable and necessary, re-classifying them as Part B claims. These Part B claims did not involve outpatient services, and were thus fraudulent. Defendants also failed to provide written notice to patients that the services were not covered under Part B.

31. As alleged above, VHS employed therapists at DSH, an acute rehabilitation facility, to perform inpatient physical therapy, occupational therapy, and speech-language pathology services.

32. None of the relevant Part B claims DSH submitted were for outpatient services, as DSH fraudulently alleged. The DSH section where Relator works does not provide outpatient services. The services actually provided were inpatient physical therapy, occupational therapy, and speech-language pathology acute rehabilitation services. However, DSH instructed employees to fraudulently submit claims for inpatient physical therapy, occupational therapy, and speech-language pathology services provided to Medicare as Part B outpatient services.

33. For example, on June 7, 2017, Tamara Barney ("Barney"), the Medicare Lead for the VHS hospitals in Nevada, sent an email to several DSH employees, including Howard Dorsky ("Dorsky"), the Systems Director and head of billing for the VHS hospitals, and Melissa Nichols ("Nichols"), Director of Rehabilitation at DSH.

34. The email included a list of Medicare Part A claims for acute rehabilitation services that were denied coverage. Barney informed them that DSH was not appealing these denials and instructed Nichols to change the medical records and re-bill the services as Part B outpatient services.

35. Nichols then instructed employees to change the medical records accordingly and resubmit the claims as Part B outpatient services. She reasoned that the patients had received the services, so DSH was resubmitting the claims to recoup its costs.

36. On July 10, 2017, Barney sent another email to Nichols and various UHS employees that included patient bills from the first list which had still not been completely re-

coded as Part B outpatient services. Again, Barney instructed Nichols to resubmit the claims as Part B outpatient services. All the bills were for services rendered in 2016

37. Nichols once again relayed this information to employees, and instructed the claims be resubmitted as Part B outpatient services.

38. To resubmit the claims, the date and time in the medical records were changed months after the services were actually rendered to match the evaluation form. They also included the specific billing codes required by Medicare Part B forms. In addition, the claims included the initial goals and projected discharge date, the current & projected goals, and the current projected discharge date on the evaluation forms. Thus, not only did Defendants falsely document the date and time of the services they billed to Medicare Part B, they fraudulently certified that the claims were for outpatient services.

39. The reason DSH's Part A claims were denied was because those patients were not appropriate for acute rehabilitation at that time. DSH knew this to be true, which is why it did not appeal those denials.

40. In an attempt to circumvent the Medicare regulations and recoup its costs in providing those services, DSH fraudulently resubmitted those claims as Medicare Part B outpatient services, even though it knew that no outpatient services were performed.

41. Because of Defendants' actions, numerous patients have been falsely certified as being eligible for Medicare Part B coverage despite not meeting the regulatory requirements.

42. In all cases in which DSH certified or re-certified patients as being eligible for Medicare Part B, DSH submitted these false certifications and fraudulent claims based on the certifications for payment in order to be reimbursed for the care of these ineligible patients. CMS, in reliance on these certifications and other fraudulent claims and statements, and without

knowledge of their falsity, reimbursed DSH for their claimed provision of Part B services to ineligible patients.

43. Had the Government known that DSH's Medicare Part B claims were fraudulently submitted on behalf of ineligible patients, it would not have reimbursed DSH for these services. To do so would put the Government in the position of funding fraudulent medical billing practices.

44. Moreover, the fraudulent reimbursement claims described in this complaint are strictly illegal and have the effect of significantly increasing the amount of reimbursement Defendants receive for their therapeutic services. These fraudulent claims have also had the effect of increasing the amount of money spent by the Government for reimbursement of Defendants' patients' care through Medicare. The payment of these reimbursement claims represents the inducement of federal payments through a pattern of fraudulent conduct and constitutes false claims within the meaning of 31 U.S.C. § 3729.

## COUNT ONE

### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENTLY BILLING MEDICARE PART B (31 U.S.C. § 3729, *et seq.*)

45. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

46. As set forth above, Defendants knowingly made or caused to be made or used false statements, certifications and records in order to get false or fraudulent claims paid or approved by the Government. The Government, unaware of the falsity of the statements, certifications, and records and claims made thereupon, was damaged in a yet undetermined amount by the aforementioned misrepresentations and the Defendants' failures to comply with requisite agreements and regulations.

47.     Defendants' course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A); 3729(a)(l)(B); 3729(a)(1)(C); & 3729(a)(l)(G).

## COUNT TWO

### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENTLY BILLING MEDICARE PART B (31 U.S.C. § 3729, *et seq.*)

48.     Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

49.     Defendants knowingly made or used false or fraudulent statements or caused false or fraudulent statements to be made or used, for the purpose of obtaining or aiding in obtaining the payment or approval of false Medicare or claims by the Government.

50.     As set forth above, Defendants purposefully overbilled and falsely billed for Medicare Part B when patients were not provided outpatient services required for eligibility.

51.     Defendants' course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A); 3729(a)(l)(B); 3729(a)(1)(C); & 3729(a)(l)(G).

## COUNT THREE

### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FAILING TO PROVIDE REQUIRED SERVICES TO ITS PATIENTS (31 U.S.C. § 3729 *et seq.*)

52.     Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

53.     Defendants knowingly made or used false or fraudulent statements or caused false or fraudulent statements to be made or used, for the purpose of obtaining or aiding in obtaining the payment or approval of false Medicare claims by the Government.

54.     Defendants submitted or caused to be submitted false or fraudulent claims to the Medicare program that were fraudulent because they were made for reimbursement of care never

provided. Defendants falsely claimed that patients were receiving outpatient services when it submitted claims under Medicare Part B, when in fact no outpatient services were actually provided. Based on these implicit and explicit false certifications, Defendants submitted false and fraudulent claims for payment to the Government.

55. Had the Government known that Defendants falsely stated that they provided outpatient services in their Medicare Part B reimbursement claims, it would not have paid for such care. The Government, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

56. This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A); & 3729(a)(1)(B).

57. Defendants' acceptance of payments for services that were not actually provided constitutes an acceptance of an overpayment. Defendants never refunded such overpayments to the Government and they continue to retain such overpayments in violation of 31 U.S.C. § 3729(a)(1)(D). Defendants have knowingly and improperly avoided or decreased their obligation to transmit the windfall they have gained back to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

**PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT**

WHEREFORE, Relator respectfully requests that this Court enter judgment against Defendants, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b) That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States before November 3, 2015; that civil penalties of $21,562.80 be imposed for each and every false claim that Defendants presented to the United States between August 2, 2016 and February 3, 2017; that civil penalties of $21,916 be imposed for each and every false claim that Defendants presented to the United States between February 4, 2017 and January 29, 2018; that civil penalties of $22,363 be imposed for each and every false claim that Defendants presented to the United States after January 29, 2018;

(c) That pre - and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the unlawful acts for which redress is sought in this Complaint;

(e) That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1),(2); and

(f) That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself, and the United States, demands a jury trial on all claims alleged herein.

Dated this the 17th day of August, 2018.

*[signature]*

Dillon G. Coil
Gabriel A. Martinez
Greenman, Goldberg, Raby & Martinez
601 S Ninth Street
Las Vegas, Nevada 89101
Tel: (702) 384.1616
Fax: (702) 384.2990
dcoil@ggrmlawfirm.com
gmartinez@ggrmlawfirm.com

W. Daniel (Dee) Miles, III (*Pro Hac Vice Forthcoming*)
C. Lance Gould (*Pro Hac Vice Forthcoming*)
Tyner D. Helms (*Pro Hac Vice Forthcoming*)
Beasley, Allen, Crow, Methvin,
  Portis & Miles, P.C.
Post Office Box 4160
Montgomery, Alabama 36103-4160
Tel: (334) 269-2343
Fax: (334) 954-7555
dee.miles@beasleyallen.com
lance.gould@beasleyallen.com
tyner.helms@beasleyallen.com

*Attorneys for Relator*